COURT OF APPEAL, THIRD CIRCUIT
NO. 08-0124

STATE OF LOUISIANA

IN THE INTEREST OF D.L.R.

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. JUV 19757
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters and James T. Genovese, Judges.

**REVERSED.**

**Nick Pizzolatto, Jr.**
**Louisiana Department of Social Services**
**Office of Community Services**
**1919 Kirkman Street**
**Lake Charles, LA 70601**
**(337) 491-2963**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Social Services**
    **Office of Community Services**

**Edward K. Bauman**
**1131 Hodges Street**
**Lake Charles, LA 70601**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **T.W.J.**

**PETERS, J.**

T.W.J. appeals a judgment rendered in favor of the State of Louisiana through the Department of Social Services, Office of Community Services (sometimes hereinafter referred to as "the state" or "OCS") terminating her parental rights to her minor child, D.R. For the following reasons, we reverse the trial court judgment.

## DISCUSSION OF THE RECORD

D.R. was born on June 5, 2004, of an extra-marital relationship between T.W.J., his mother, and J.L.R., his father.[1] The parents did not maintain a home together after D.R.'s birth. Instead, D.R.'s mother retained custody and, by May of 2005, had begun cohabiting with another man, S.B. On May 24, 2005, D.R. sustained severe injuries from physical abuse while in the physical custody of S.B. Although T.W.J. was not present when the injuries were sustained,[2] the state took physical custody of D.R. and placed him in foster care. Sometime thereafter, T.W.J. and representatives of OCS entered into a case management plan which imposed a number of obligations for T.W.J. to fulfill before she could be reunited with her son.[3]

On November 14, 2006, T.W.J. met with a number of OCS personnel for a status review and a family team conference. The written report prepared after the meeting is a part of the evidentiary record and states that the initial reason for D.R.'s

---

[1]The trial court rendered judgment against J.L.R., terminating his parental rights as well. However, he has not appealed that judgment. Thus, the only issue before us is the correctness of the judgment terminating the parental rights of T.W.J.

[2]She was at work when the injuries occurred.

[3]The review of this case is severely hampered by the fact that the petition to terminate the parental rights of T.W.J. and J.L.R. was not filed in the same proceedings as the child in need of care proceedings in which OCS obtained custody of D.J. Instead, OCS filed it as a separate suit, and at trial offered only the content of the termination record into evidence. This record does not contain any of the original pleadings in the prior proceedings, nor does it contain the original case management plan upon which the petition to terminate is based. That being the case, we are left only with some subsequent documents prepared in monitoring the original case management plan as well as the testimony of various individuals concerning their interpretation of what was in the original case management plan.

removal to the state's custody was T.W.J.'s refusal to acknowledge, immediately after D.R.'s injury, that S.B. caused his injury. The report stated that "[s]ince [T.W.J.] refused to find another residence or stop her relationship with [S.B.], an Instanter Order was requested on May 24, 2005 placing [D.R.] in State's custody."

With regard to the requirements of the original case plan, the report contained the following:

> [T.W.J.] completed the following recommended services:
>   1) Parenting Classes were provided by Family & Youth Counseling Agency on 8/10/05 and [T.W.J.] successfully completed it in 8/30/05. [T.W.J.] personally paid for the group parenting class, which was held on 8/31/05.
>   2) Anger Management offered by Ms. Molly Larson was completed by [T.W.J.] on 9/12/05. Individual counseling was recommended.
>   3) Assessment at LCADC was conducted on 12/12/05 and results were negative. Case was closed by LCADC because no treatment was necessary.
>   4) Psychological Evaluation was conducted by Dr. Buxton on 3/31/06. He recommended counseling to address Post Traumatic Stress Disorder, Dysthymic Disorder and Personality Disorder with Dependent Features. Dr. Buxton stated that the only way [T.W.J.] could parent [D.R.] was in the home of a responsible adult caregiver to assist her in caring for a special needs child.
>   5) Common Sense Parenting class sponsored by Boys Town was successfully completed by [T.W.J.] on 8/24/06.
>   6) Domestic Violence group counseling sponsored by Calcasieu Women's Shelter was attended by [T.W.J.] on 9/28/06.

The report also stated that sometime before the November 2006 conference, T.W.J. had changed her attitude toward S.B.'s role in causing her child's injuries. That is to say, she acknowledged her mistake in originally believing that he had not injured D.R. The report also stated that the state had no immediate plans to pursue termination of the parents' rights.[4] The report made it clear that the foster care

---

[4]This comment conflicted with another notation in the same report. On the page of the report addressing the long-term plan for D.R., the box checked is that of "Adoption."

2

parents were not interested in adopting D.R. and that OCS's search for an appropriate placement had eliminated all non-parental relatives as potential care givers for D.R. Concerning "the overall progress or lack of progress made toward achievement of a safe permanent living arrangement for [D.R.]," the report provided the following:

> [T.W.J.] has minimally complied with her Case Plan. She has had two different jobs and residences since June. She is currently renting to own a two bedroom mobile home in Lake Charles, La. She continues to state that she has not had any contact with [S.B.] nor does she know his current address.

Concerning the goals of the case plan, the report stated the following with regard to T.W.J.'s obligations:

> 1. [T.W.J.] needs to provide a safe, clean and stable home environment free of hazards, criminal activity and substance abuse.
>
> 2. [T.W.J.] needs to become a more responsible parent to her child and parent him in ways that do not involve abuse or neglect.
>
> 3. [T.W.J.] needs to cooperate with the agency and the court.
>
> 4. [T.W.J.] needs to maintain a positive and loving relationship with her child.

The requirements of this plan of action were punctuated with the not-so-veiled threat that "[i]n the event that reunification cannot be achieved[,] permanency for [D.R.] will be achieved by the time the [child] [has] been in foster care for one year. This will be May 2007."[5]

The next status review and family team conference occurred on May 21, 2007, and the bulk of the entries in the written report, prepared after that meeting and made a part of the evidentiary record, are word-for-word exactly those found in the November 14, 2006 report. However, in the section addressing "the overall progress

---

[5]In fact, despite the entries concerning T.W.J.'s compliance with the original plan, other entries in this report suggest that OCS had already determined that the ultimate goal was adoption.

3

or lack of progress made toward achievement of a safe permanent living arrangement for [D.R.]," the report provided the following:

> [T.W.J.] has minimally complied with her Case Plan. Her employment has been unsteady, however, she has been residing in the same residence for over 8 months in Lake Charles, La. [T.W.J.] stated that she has not had any contact with [S.B.] nor does she know his current address.

Thereafter, on July 25, 2006, the state filed the petition now before us seeking termination of the parents' parental rights, and trial on the merits was held on June 21, 2007, with all litigants being represented by counsel at trial. In support of its request for a judgment of termination of parental rights, the state introduced the record of the termination proceedings as its only exhibit. Additionally, Wendy Sprigg, T.W.J.'s original foster care worker; Caprecia Ryan Botley, a former supervisor for court programs (including misdemeanor probation programs) for the Fourteenth Judicial District Court; Charlotte Butler, a Lake Charles, Louisiana licensed clinical social worker; Mollie Larson, a Lake Charles, Louisiana licensed marriage and family therapist and professional counselor; and Dr. Alfred Buxton, a Lake Charles, Louisiana psychologist, all testified on behalf of the state. T.W.J. also testified.

The trial record established that D.R. is a special needs child who has a left hemispheric injury that affects his speech and vision and causes him to suffer from developmental delays.[6] All of his physical, mental, and emotional difficulties arise from the incident of May 24, 2005. The record also establishes that T.W.J. is a high school graduate, has an intelligence level within normal limits, but has a vocabulary of a fifth grader. She was a victim of sexual abuse as a child and suffers from a mild,

---

[6]The record does not contain any medical reports describing the injuries to D.R., or his current medical condition, or a prognosis. Most of the medical information discussion in this opinion arises from comments in the testimony of Dr. Buxton, a psychologist.

4

but chronic, post traumatic stress disorder. Because her family did not believe her when she informed them of her sexual abuse, she developed a low-level depression condition which became chronic and with which she still must contend on a day-to-day basis.

Ms. Sprigg testified that when the first case plan was formulated, OCS recommended a particular parenting program which was twelve weeks in length and a particular anger management program which was forty-five days in length. However, the classes taken by T.W.J. were much shorter. Additionally, requirements of the original case plan included stable housing and employment. According to Ms. Sprigg, T.W.J. had multiple residences during the period from May 24, 2005, through the beginning of the termination proceedings, and at times she failed to inform OCS of her change of address. However, she acknowledged that, at worst, within a week after a move, T.W.J. would surface for OCS to continue its monitoring obligation.

Obvious from Ms. Sprigg's testimony was her concern that T.W.J. continued to live with S.B. after May 24, 2005. Ms. Sprigg testified that she discussed her suspicions on this point with T.W.J., but had no direct proof that her suspicions were well-founded. In fact, her suspicions were based solely on information she received through the criminal court proceedings in Calcasieu Parish involving S.B. According to Ms. Sprigg, court personnel informed her that some of the addresses given by S.B. during his movement through the criminal court system were the same as those T.W.J. had given her. However, at no time when she visited T.W.J. at her residence did Ms. Sprigg see any evidence of S.B. residing at the house.

Ms. Botley's testimony related to the possible continuing association of T.W.J. with S.B. As the former supervisor for court programs, she personally supervised

5

S.B.'s probation for a possession of marijuana conviction. During that period, S.B. informed her that his girlfriend was a woman whose first name was the same as that of T.W.J. However, she acknowledged that she never met T.W.J., so she could not verify that the woman mentioned by S.B. and T.W.J. were one and the same.

Ms. Butler testified that she became involved in T.W.J.'s case by a referral from Cynthia White, T.W.J.'s case worker,[7] and first saw T.W.J. professionally on January 10, 2007. After three sessions with T.W.J., she concluded that T.W.J.'s ability to care for a special needs child was questionable. She based her opinion on her study of T.W.J.'s prior social history as provided to her by OCS; a March 31, 2006 psychological evaluation performed by Dr. Buxton; and her own findings in her sessions with T.W.J. According to Ms. Butler, T.W.J. clearly loved her child and professed a willingness to do whatever was required of her to win back D.R.'s custody. In fact, Ms. Butler testified that T.W.J. had attempted to do everything requested of her by OCS since May 24, 2005, even though she may have performed some of the tasks grudgingly. According to Ms. Butler, T.W.J. clearly saw herself as being fully capable of caring for D.R.'s needs, as not needing parenting classes or counseling, and as being angry about OCS's intervention in her life. Because Ms. Butler perceived T.W.J. to be in a state of denial, she did not recommend further counseling because she was of the opinion it would not be helpful unless and until T.W.J. acknowledged her need for professional intervention in her life.

Ms. Larson conducted the four-hour basic anger education class attended by T.W.J. in September of 2005. She testified that T.W.J. arrived one hour late for the class, would not answer questions along with the rest of the class participants, and

---

[7]At some time before trial, Ms. White replaced Ms. Sprigg as T.W.J.'s case worker. In fact, at the time of trial, Ms. Sprigg was Ms. White's immediate supervisor.

would not discuss any choices or options that might be available to her. Ms. Larson summarized T.W.J.'s participation and attitude toward change as "poor."

Dr. Buxton first saw T.W.J. on March 31, 2006, and is responsible for having diagnosed her physiological condition and intellectual capacity as previously described. He testified that, given his findings and conclusions, he clearly understood why T.W.J. did not perceive herself as having problems because of what she had already lived through. In his opinion, her past history had manifested in a dependent personality that made her an easy mark for others who might take advantage of her. In his opinion, she is always looking for someone to like or love her.

Dr. Buxton specifically disagreed with many of the OCS case plan requirements, particularly the anger management aspect. Noting that T.W.J. had always been polite in dealing with him, and pointing to her composure when she was challenged at trial by the attorneys involved,[8] he concluded that anger management was not a problem with her. In fact, Dr. Buxton considered T.W.J. to be as much a victim as was her child. However, despite Dr. Buxton's admiration for T.W.J.'s composure in court, with regard to her ability to care for her son, the doctor's testimony was less favorable to her.

According to Dr. Buxton, D.R.'s special needs are what really complicate matters in this litigation. D.R. will continue to need special programs such as physical, occupational, and speech therapy in the future, and T.W.J.'s failure to avail herself of training to address these needs is of deep concern to Dr. Buxton. D.R.'s seizures[9] will require monitoring as well as administration of epileptic medicine

---

[8]At trial T.W.J. testified before Dr. Buxton testified.

[9]Again, other than Dr. Buxton's reference to the child being subject to seizures, the record is silent on this point.

which, if administered in improper levels, is toxic. Dr. Buxton was of the opinion that, as of the time of trial, T.W.J. could not be D.R.'s primary care giver, although she might qualify as a secondary care giver. That is to say, if she were to regain custody of D.R., she would be able to provide minimal routine care, but could not handle a crisis. Although recognizing T.W.J.'s ability to provide shelter, maintain employment, and to even save money, and although being convinced that T.W.J. loves her child and would try to do her best, Dr. Buxton stated that:

> It has nothing to do with love. It has to do with recognizing the problems of that child and being able to meet the needs of that child at this point in time. And I just don't see where she's going to be able to do that, as a primary care giver.

In his opinion, she had managed to get by at a marginally acceptable level with minimally adequate provision for her children.

While he did not find T.W.J. to be able to care for D.R. at the time of trial, he did not rule out improvement in the future. He acknowledged that special services would benefit her, but was concerned whether they would be available to her in the immediate future. Furthermore, assuming she could educate herself to the special needs of her son, such an undertaking would mandate that she cease gainful employment. With regard to special training for T.W.J., the doctor candidly admitted that the OCS case plan failed to even address this issue and required that T.W.J. do all the wrong things.

After completion of the hearing on June 21, 2007, the trial court took the matter under advisement. On July 25, 2007, the trial court filed written reasons for judgment terminating T.W.J.'s parental rights. The trial court signed a judgment to this effect on August 9, 2007, and T.W.J. perfected this appeal. In her sole assignment of error, T.W.J. asserts that the trial court erred in finding that the state had established by

8

clear and convincing evidence that there had been no substantial compliance with the

case plan.

## OPINION

In *State in the Interest of J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806,

810-11, the supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M..*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the

legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d [183] at 185.

Title X of the Children's Code governs the involuntary termination of parental rights. LA. CHILD. CODE art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privilege of parents. The State need establish only one ground, LA. CHILD. CODE art. 1015, but the judge must also find that the termination is in the best interest of the child. LA. CHILD. CODE art. 1039. *See State in Interest of ML & PL*, 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. LA. CHILD. CODE art. 1035(A); *Santosky v. Kramer*, 445 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

Thus, the state's burden in this matter was to establish by clear and convincing evidence one of the statutory grounds for involuntary termination of T.W.J.'s parental rights *and* that termination of her parental rights is in D.R.'s best interest.

While La.Ch.Code art. 1015 provides a number of grounds for termination of parental rights, in the instant case, the state sought termination of T.W.J.'s parental rights pursuant to La.Ch.Code art. 1015(5), which provides for termination where:

[A]t least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Concerning the first element, T.W.J. does not dispute that over one year has elapsed since the state removed D.R. from her custody pursuant to court order.[10] Concerning

---

[10]We noted in footnote 4, however, OCS did not wait one year to consider termination of parental rights. The November 14, 2006 report suggested that, at that time, OCS's long-term plan

the question of compliance with a case plan for services, La.Ch.Code art. 1036(C) provides:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing renunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

In its petition, the state asserted that T.W.J. failed to avail herself of services offered in that:

> [She] has only attended one (1) parenting class as her attempt to comply with the case plans, and that was at an unapproved facility.
>
> [She] attended only a one (1) day anger management class.
>
> [She] refused to complete the domestic violence course.
>
> [She] refuses to stop seeing the boyfriend who physically abused her child.

---

for D.R. was adoption.

In interpreting these allegations, we conclude that the state's claim of non-compliance with its case plan arises under La.Ch.Code art. 1036(5) and (7) as set forth above. We conclude, however, that the evidence does not establish by clear and convincing evidence that T.W.J. violated the provisions of La.Ch.Code art. 1036(5) and (7) in these respects.

Because this record does not contain the original child in need of care proceedings, it also does not contain the original case plan.[11] Thus, our first reference in this record to its content is the November 14, 2006 written report referencing T.W.J.'s obligations under that plan. That report does not support the state's position that T.W.J. did not meet her obligations.

With regard to the state's first three assertions, the November 14, 2006 report specifically states that T.W.J. "successfully completed" a parenting class, that she "completed" an anger management class, and that she "completed" domestic violence counseling. Nothing in this report suggests that OCS was dissatisfied with her efforts. The only evidence suggestive of dissatisfaction is derived from the testimony of Ms. Sprigg, whose complaint was that T.W.J. did not complete the particular parenting and anger management classes OCS recommended.[12]

The complaint that T.W.J. continued to cohabit and/or associate with S.B. is also not established by clear and convincing evidence. The November 14, 2006 report specifically states that T.W.J. had changed her mind concerning S.B.'s role in

_____

[11]In fact, although no one objected to references to the original case plan, the record contains no evidence that any such case plan was ever approved by the trial court as required by La.Ch.Code art. 1015(5).

[12]It is interesting to note that the recommended classes were twelve weeks in length for the parenting program and forty-five days in length for the anger management program. OCS expected T.W.J. to attend these extensive programs and keep up with numerous other obligations, including maintaining full employment, while completing the programs.

the injury sustained by D.R.  Ms. Sprigg's concerns to the contrary were based completely on hearsay statements not supported by her own investigation.

The record contains complaints by OCS of other instances of noncompliance, but these complaints did not constitute the basis for termination of parental rights as set forth in the state's original petition.  Further, even these complaints were established only by questionable proof.[13]

The most compelling evidence supporting rejection of the petition to terminate T.W.J.'s parental rights at this time is the testimony of Dr. Buxton.  The substance of the doctor's testimony is that OCS's plan did not meet her needs.  According to the doctor, the compliance program created by OCS's case plan did not meet T.W.J.'s needs because it did not provide for the training to assist her in meeting the physical, occupational, and speech therapy needs of her son.[14]  Significantly, Dr. Buxton did not state that T.W.J. could not be trained to be the primary care giver in the future, only that she was not, at the time of trial, qualified to perform those obligations. Thus, the state failed to establish by clear and convincing evidence that "there is no reasonable expectation of significant improvement in [T.W.J.'s] condition or conduct in the near future," as required by La.Ch.Code art. 1015(5).

Even assuming for purposes of argument that the state carried its burden of proof on one factor found in La.Ch.Code art. 1015, its burden of proof is not complete at that point.  It must also establish by clear and convincing evidence that the termination of T.W.J.'s parental rights is in D.R.'s best interest.  At this time, the

---

[13]For example, Ms. Sprigg complained that T.W.J. moved residences often in violation of the case plan.  However, the May 21, 2007 report stated that she had maintained the same residence for over eight months prior to the meeting giving rise to that report.

[14]The doctor's critique of the OCS case plan suggested that it constituted nothing more than a standardized plan with no consideration of the special circumstances of this particular case.

13

record before us contains no evidence even suggesting that the loss of what T.W.J. might be able to provide to her son with appropriate training would be replaced with a better situation. As expressed by the supreme court in *State in the Interest of J.A.*, 752 So.2d at 810-11, D.R.'s "profound interest" in terminating his mother's parental rights is based on the concept that such an action would allow him "secure, stable, long-term, and continuous relationships found in a home with proper parental care." The state presented no evidence that it has a plan in place for D.R.'s future. In fact, the only evidence in the record is to the contrary.[15]

In considering cases of this nature, we must be mindful of the instruction provided to us by the supreme court in *State in the Interest of J.A.*, 752 So.2d 806, and proceed cautiously because of the drastic and devastating consequences of a decision addressing parental rights. While we must recognize that the child's best interest trumps the parent's interest, that consideration is tempered with the strenuous requirement imposed on the state that it establish the particulars of the relationship by clear and convincing evidence.

We also recognize that the one-year requirement of La.Ch.Code art. 1015(5) is intended to ensure that something be done as quickly as possible to effect stability and permanency in the life of a child removed from his parents. We perceive this time limitation as something more than an automatic, artificial deadline. In the matter before us, the state's own witness testified that OCS's plan of reunification was not what was needed in this case. This plan, even if fully complied with, would still have rendered T.W.J.'s reunification with her son next to impossible. That is to say, she

---

[15]The only suggestion of an extended relationship is found in the current foster family. However, the evidence is clear that the foster family is not interested in adopting D.R.

14

would still not have received the training she needs to have a chance to care for her son whom, everyone agrees, she loves very much.

While we reverse the trial court's decision to terminate T.W.J.'s parental rights, we do not mean to suggest that termination of those rights might not ultimately be required in the future. We merely hold that, at this time, the state has not met its heavy burden of presenting clear and convincing proof.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment terminating the parental rights of T.W.J.

**REVERSED.**